IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| BLUES EVENTS, LLC, et al.,<br><br>            Plaintiffs,<br><br>vs.<br><br>LINCOLN PROFESSIONAL BASEBALL, INC., d/b/a LINCOLN SALTDOGS, et al.,<br><br>            Defendants. | 4:13-CV-3101<br><br>MEMORANDUM AND ORDER |

This matter is before the Court on the defendants' motion for summary judgment (filing 19) and motion for sanctions pursuant to Fed. R. Civ. P. 11(c) (filing 33). The Court will grant the motion for summary judgment, but deny the motion for sanctions.

BACKGROUND

This case arises from a joint venture to put on a concert at Haymarket Park, a baseball stadium in Lincoln, Nebraska. The plaintiffs are Tim Tucker, a Colorado businessman; Direct Music Distribution, LLC (DMD), Tucker's company; and Blues Events LLC, a Colorado company that was formed by Tucker and others for purposes of this joint venture. Filing 1 at 4; filing 40 at 1-2. The current defendants are Lincoln Professional Baseball, Inc., d/b/a Lincoln Saltdogs (the Saltdogs), and Charlie Meyer, its president; the Saltdogs are a minor league baseball team that plays at Haymarket Park. Filing 1 at 5. Loosely described, the joint venture came about because Tucker and his associates were in the music and concert promotion business, while the Saltdogs had a venue for the show.

The parties began discussing the concert in April 2012. Filing 40 at 1. In late April, Tucker brought in Feyline International, a company run by experienced concert promoter Barry Fey. Filing 1 at 5; filing 40-1. On May 17, DMD, Feyline, the Saltdogs, and the University of Nebraska Alumni Association executed a letter of intent setting forth the basic parameters of

the venture.[1] Filing 40-2. On June 6, Blues Events' articles of organization were filed with the Colorado Secretary of State; the registered agent and "person forming the limited liability company" was listed as Ann Maul. Filing 40-3. Tucker explains that Maul was named "the sole member and registered agent" of Blues Events "[i]n an effort to maintain a corporate entity separate from the main players in the negotiation . . . ." Filing 40 at 2.

By June 20, 2012, a draft joint venture agreement had been created. Filing 1 at 30-39. Tucker emailed Meyer expressing disagreement with some of the language of the draft agreement, particularly regarding production costs, and when payments would be made from which proceeds. Filing 40-7 at 2. Tucker suggested that ticket sales would be "completed" by August 3 for the August 31 concert, and that production costs could be deducted first and paid from the proceeds of initial sales. Filing 40-7 at 2. Meyer was concerned that if the tickets did not sell out by that date, risk was being shifted to the venue. Filing 40-7 at 1. A conference call was held a few days later, and while there were still financial points to discuss, the venture proceeded. Filing 40-8.

Meyer sent a final, signed joint venture agreement (the Agreement) to Tucker on June 29, 2012. Filing 17 at 41-59. The only parties to the Agreement were the Saltdogs and Blues Events. Filing 40-5 at 1. Maul signed the Agreement on behalf of Blues Events on July 2. Filing 1 at 53; filing 40 at 3. But Tucker claims that the Agreement did not represent what he and Meyer had previously agreed to. According to Tucker, he was out of town when Meyer sent him the Agreement, so he had his assistant deliver it to Maul for signing. Filing 40 at 3. It was only after he returned to the office on July 5, he says, that he "became aware of the material differences between the agreed-upon language Meyer and [he] had discussed the week before, and the language in the final Agreement." Filing 40 at 3-4.

Tucker sent a memo to Meyer dated July 6, 2012, complaining about some of the language in the Agreement. Filing 40-10. Specifically, he asserted the Agreement should have provided that the concert could be canceled if ticket sales were insufficient by August 1. Filing 40-10 at 1. A bond or insurance was to be paid equally by the parties to protect against cancellation due to "act of god." Filing 40-10 at 1. And with respect to payments, Tucker specifically objected to a provision of the Agreement for a $100,000 upfront payment from Blues Events to the Saltdogs. Filing 40-10 at 1. But, in a separate email, Tucker wrote that while those issues needed clarification, his

---

[1] Although the letter states that its "date of execution" is May 8, it appears from the fax information on the exhibit, and the parties' related emails, that it was not actually signed until later. *See*, filing 40-2; filing 40-4 at 1-3. But the exact date is not important.

"understanding is August 9 we are ready to go on sale and start work selling tickets, sale date." Filing 20-1 at 4.

On July 9, Meyer replied that "again changing the deal" would not be acceptable and that the event would be in jeopardy. Filing 20-1 at 4. Tucker replied: "Leave alone then. We will go with what we got. The investor is the one that is worried about every detail and becoming very annoying. I will deal with them. Its [sic] time to stop coddling them[.]" Filing 20-1 at 4.

The Agreement also stated, in relevant part, that Blues Events was relying upon a commitment to provide licenses for University of Nebraska name and logo use. Filing 40-5 at 3. Such an agreement between the Alumni Association and the Saltdogs was effective July 11, 2012. Filing 1 at 66-70. There were some intervening disagreements over insurance and field protection, but they are not particularly relevant. It is interesting to note, however, that in an August 27 email to several Saltdogs officials, Tucker referred to apparently disappointing preshow ticket sales; contrary to some of his earlier representations, Tucker said that "as originally understood from day one[,]" he believed "most sales would be day of show." Filing 17 at 40.

The concert took place as planned on August 31, 2012. Filing 1 at 19. The Agreement provided for a final settlement of expenses and profits or losses on the day after the concert, with the net profits (after payments required by the Agreement were made) to go to Blues Events. Filing 40-5 at 5. According to Tucker, he attempted to contact the Saltdogs employee in charge of the box office, but was unable to reach him. And Tucker claims that no proceeds were ever distributed to Blues Events. Filing 40 at 4.

This proceeding ensued, in which Tucker, DMD, and Blues Events initially sued the Saltdogs, Meyer, the University of Nebraska-Lincoln, the Alumni Association, and "Haymarket Park Stadium." Filing 1 at 1. Only the Saltdogs and Meyer remain, and they have moved for summary judgment.

## STANDARD OF REVIEW

Summary judgment is proper if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the Court of the basis for the motion, and must identify those portions of the record which the movant believes demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc). If the movant does so, the nonmovant must respond by submitting evidentiary materials that set out specific facts showing that there is a genuine issue for trial. *Id.*

On a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to

- 3 -

those facts. *Id.* Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the evidence are jury functions, not those of a judge. *Id.* But the nonmovant must do more than simply show that there is some metaphysical doubt as to the material facts. *Id.* In order to show that disputed facts are material, the party opposing summary judgment must cite to the relevant substantive law in identifying facts that might affect the outcome of the suit. *Quinn v. St. Louis County,* 653 F.3d 745, 751 (8th Cir. 2011). The mere existence of a scintilla of evidence in support of the nonmovant's position will be insufficient; there must be evidence on which the jury could conceivably find for the nonmovant. *Barber v. C1 Truck Driver Training, LLC,* 656 F.3d 782, 791-92 (8th Cir. 2011). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. *Torgerson,* 643 F.3d at 1042.

## DISCUSSION

The plaintiffs' complaint contains four claims for relief: "fraudulent misrepresentation/fraud in the inducement," breach of fiduciary duty, conversion, and breach of contract. Filing 1 at 20-23. Each will be addressed, but before doing so, it is necessary to clarify which plaintiffs can properly advance those claims.

### BLUES EVENTS' CERTIFICATE OF AUTHORITY

Specifically, the defendants contend that Blues Events lacks capacity to bring these claims in Nebraska because it does not have a certificate of authority to transact business in Nebraska. The Court agrees.

The Nebraska Uniform Limited Liability Company Act, Neb. Rev. Stat. § 21-101 *et seq.* (Reissue 2012), provides that "[a] foreign limited liability company transacting business in this state may not maintain an action or proceeding in this state unless it has a certificate of authority to transact business in this state." § 21-162. Nebraska's former Limited Liability Company Act, Neb. Rev. Stat. § 21-2601 *et seq.* (Reissue 2012), which terminated January 1, 2013, similarly provided that "[n]o foreign limited liability company transacting business in this state without a certificate of authority shall be permitted to maintain any action, suit, or proceeding in any court of this state until such limited liability company has obtained a certificate of authority." § 21-2643. Because this case is brought under the Court's diversity jurisdiction, it is, for these purposes, in effect only another court of Nebraska. *See Woods v. Interstate Realty Co.,* 337 U.S. 535, 538 (1949); *see also Weeks Constr., Inc. v. Oglala Sioux Hous. Auth.,* 797 F.2d 668, (8th Cir. 1986) (federal court has diversity jurisdiction only if courts of state in which federal court sits can entertain suit). And so, lacking a certificate of

- 4 -

authority, Blues Events lacks capacity under Nebraska law to bring these claims in Nebraska. *See Woods*, 337 U.S. at 536-38.

The defendants have presented evidence that Blues Events does not have a certificate of authority to transact business in Nebraska, and Blues Events does not contend otherwise. *See*, filing 21 at 2-3; filing 39 at 3-4. Instead, Blues Events argues that it is not required to have a certificate of authority because it was not "transacting business" in Nebraska. Filing 39 at 5-6. And it contends that the defendants are estopped from asserting that Blues Events did not have the proper credentials to do business in Nebraska. Filing 39 at 6. Both arguments are without merit.

Blues Events' first argument relies on the respective statutes explaining when a foreign LLC's activities do not constitute "transacting business." The Nebraska Uniform Limited Liability Company Act provides that activity is not "transacting business" if it consists of "conducting an isolated transaction that is completed within thirty days and is not in the course of similar transactions." § 21-157(9). And the Limited Liability Company Act contained a nearly identical provision. § 21-2644(1)(j).

But the undisputed facts show that the "isolated transaction" exception does not apply here. The concert, standing alone, might have been an isolated transaction. But Blues Events engaged in extended negotiation, and then promotion and production of the concert, from no later than the execution of the Agreement—and was required by the Agreement to do so. It is, in fact, alleged in the plaintiffs' complaint that because of the delay in reaching the licensing agreement, "Blues Events was unable to begin actually marketing the concert until . . . July 11, 2012 . . . ." In other words, the complaint, the Agreement, and the evidence establish as a matter of law that Blues Events' activities in Nebraska associated with the concert were not completed within 30 days. This was not an "isolated transaction."

Nor are the defendants estopped from asserting this defense. Blues Events relies on a provision in the Agreement stating that "[e]ach party to this Agreement represents to the other that it has all necessary licenses and permits to do business in the State of Nebraska, and each party acknowledges that each of the others is relying upon such representations as a basis for entering into this Joint Venture Agreement." Filing 40-5 at 1. Blues Events argues that "by transacting business with Plaintiffs upon the promise in the [Agreement] that they would warrant that each party had the proper licenses, Defendants have waived their right to make such an assertion now." Filing 39 at 6.

But that is not what the Agreement said. The Agreement simply contained the representation of each party, to the other, that it was authorized to do business in Nebraska—neither party, under the Agreement,

- 5 -

was warranting that the *other* party was authorized. In other words, this provision not only fails to support Blues Events' argument, it directly undermines it. Under the Agreement, Blues Events represented its own authority to do business, *and* Blues Events acknowledged that the Saltdogs were relying upon that representation. There is obviously no basis for estopping the defendants from claiming, now, that Blues Events' representation was false.

In short, under Nebraska law, Blues Events does not have the capacity to maintain this action. On that ground, the Court will grant summary judgment in favor of the defendants and against Blues Events with respect to each of the plaintiffs' claims, leaving each of the plaintiffs' four claims to be discussed to the extent that they can be brought by Tucker and DMD. That extent is not extensive. The particulars of why Tucker and DMD do not have claims for relief are best understood in the context of each claim, and will be explained below. But it is useful to note at the outset there is nothing in the record which supports (or is purported to support) any legal theory by which Tucker or DMD could advance claims belonging to Blues Events. There are not, for instance, any derivative claims. *See,* § 21-165; *Klingelhoefer v. Parker, Grossart, Bahensky & Beucke, L.L.P.,* 834 N.W.2d 249, 254-56 (Neb. App. 2013). Nor is there any basis to find a special duty owed to Tucker or DMD separate from Blues Events, or that Tucker or DMD suffered a separate and distinct injury. *See, Freedom Fin. Grp. v. Woolley,* 792 N.W.2d 134, 140-41 (Neb. 2010); *Meyerson v. Coopers & Lybrand,* 448 N.W.2d 129, 134-35 (Neb. 1989). Nor, in the absence of any information about Blues Events' membership or structure, would there be a basis for awarding an individual recovery. *See Trieweiler v. Sears,* 689 N.W.2d 807, 836-38 (Neb. 2004). Simply put, it is clear from the pleadings that Tucker and DMD are attempting to allege their own individual claims.

### FRAUDULENT MISREPRESENTATION/FRAUD IN THE INDUCEMENT

The plaintiffs' first claim for relief is titled "Fraudulent Misrepresentation/Fraud in the Inducement." Filing 1 at 20. That title confusingly describes two distinct legal claims that actually have little in common, aside from both containing the word "fraud."

The claims are best understood by reference to the allegations upon which they are based. The plaintiffs allege that

> on or about June 29, 2012 Mr. Meyer represented to Mr. Tucker on the telephone that he was reading the entire finalized Joint Venture Agreement to him, line by line. Mr. Meyer also represented that he had in place a commitment from [the Alumni

> Association] permitting [the Saltdogs] to pass along permission to Blues Events to use the University's logo and marks as soon as the Agreement was signed.

Filing 1 at 20. These representations, the plaintiffs allege, were false. And as a result, the plaintiffs claim, Tucker instructed Maul to sign the Agreement which (purportedly unknown to Tucker) provided for the upfront payment of $100,000 to the Saltdogs. Filing 1 at 21. Furthermore, the plaintiffs claim, the delay in obtaining permission to use University of Nebraska logos and marks delayed marketing of the concert, hurting ticket sales. Filing 1 at 21.

There are two putative claims for relief there: a tort claim and a contract claim. The tort claim is fraudulent misrepresentation, which under Nebraska law requires proof that (1) a representation was made; (2) the representation was false; (3) when made, the representation was known to be false or made recklessly without knowledge of its truth and as a positive assertion; (4) the representation was made with the intention that the plaintiff should rely on it; (5) the plaintiff did so rely on it; and (6) the plaintiff suffered damage as a result. *Zawaideh v. Neb. Dep't of Health & Human Servs.*, 825 N.W.2d 204, 212 (Neb. 2013). But the record is clear that pursuant to the Agreement, any damages suffered from reduced ticket sales were suffered by Blues Events. Now, perhaps Tucker or DMD expected a share of Blues Events' profits—but if so, their recovery would be from Blues Events, not the defendants.

The contract claim, which the plaintiffs refer to as fraud in the inducement, is really more like fraud in the execution, although there are aspects of both. Fraud in the inducement goes to the means used to induce a party to enter into a contract, while fraud in the execution goes to the very existence of a contract, such as where the contract is misread to a party, or where one paper is surreptitiously substituted for another, or where a party is tricked into signing an instrument he or she did not mean to execute. *See Gonzalez v. Union Pac. R.R. Co.*, 803 N.W.2d 424, 442 (Neb. 2011). The plaintiffs' allegation regarding licensing and promotion would suggest fraud in the inducement, while the allegation regarding the upfront payment is clearly fraud in the execution. *See id.*

But again, any claim regarding the Agreement belongs to the contracting plaintiff—Blues Events. Tucker and DMD are not parties to the Agreement.[2] And even if they were—or Blues Events was properly before the Court—the claim would lack merit, for three reasons.

---

[2] The plaintiffs assert that "both Tucker and DMD were intended beneficiaries" of the Agreement. The plaintiffs' "third party beneficiary" argument will be discussed more fully

First, as to fraud in the execution, it is generally held that courts will not permit a party to avoid a contract into which that party has entered on the grounds that he or she did not attend to its terms, that he or she did not read the document which was signed and supposed it was different from its terms. *In re Claims against Atlanta Elevator, Inc.*, 685 N.W.2d 477, 493 (Neb. 2004). That doctrine is not applicable where the defense is that the writing, by reason of fraud, does not embrace the contract actually made. *Eicher v. Mid Am. Fin. Inv. Corp.*, 748 N.W.2d 1, 13 (Neb. 2008). But Tucker—the person to whom the misrepresentation was purportedly made—did not sign the Agreement. Maul did, and she had authority to do so. There is nothing to suggest that a misrepresentation was made to Maul, or that she did not have the opportunity to review the Agreement. There was simply no fraud involved in *Maul's* execution of the Agreement.

Second, a claim for fraud in the execution renders an agreement void. *Gonzalez*, 803 N.W.2d at 442. Fraud in the inducement renders the agreement voidable. *Id.* But the plaintiffs do not ask for the Agreement to be declared void.³ So, neither theory supports the damages that the plaintiffs have actually requested.

And finally, it is absolutely clear from the record that even if the contract was induced or executed as a result of fraud, the terms of the Agreement were subsequently ratified. *See, e.g.*, *Brook Valley Ltd. P'ship v. Mut. of Omaha*, 825 N.W.2d 779, 789 (Neb. 2013); *Kracl v. Loseke*, 461 N.W.2d 67, 75 (Neb. 1990); *Sack Lumber Co. v. City of Sargent*, 140 N.W.2d 796, 798 (Neb. 1966); *Nathan v. McKernan*, 101 N.W.2d 756, 767 (Neb. 1960); *compare Haynes v. Farmers' & Merchs.' State Bank of Wahoo*, 224 N.W. 316, 318 (Neb. 1929). In response to Meyer's insistence on retaining the provision for an upfront $100,000 payment, Tucker told Meyer to "[l]eave alone then.

---

below, and would be unavailing here for same reasons as it is there. It is not clear, exactly, which claims this assertion is intended to support—the plaintiffs' brief is neither comprehensive nor clear. It contains barely a page of actual argument, *see* filing 39 at 5-6, and shows some disregard for the particulars of our local rules regarding motion briefs. *Compare, e.g.*, filing 39 at 3-4 *with* NECivR 56.1(b)(1). The Court has endeavored to give the plaintiffs every benefit of the summary judgment standard of review. But at some point, failure to clearly plead and brief the issues has consequences.

³ The defendants raised the doctrine of election of remedies as an affirmative defense. Filing 17 at 31. But the plaintiffs have not asked for inconsistent remedies. And more importantly, inconsistent claims are permitted in federal court. Fed. R. Civ. P. 8(d)(3); *see Myzel v. Fields*, 386 F.2d 718, 740 n.15 (8th Cir. 1967). So the doctrine of election of remedies has been largely abrogated in federal court as a pleading standard, and remains vital only insofar as it bars a double recovery. *See Olympia Hotels Corp. v. Johnson Wax Dev. Corp.*, 908 F.2d 1363, 1371-72 (7th Cir. 1990); *see also Pa. Nat'l Mut. Ins. Co. v. City of Pine Bluff*, 354 F.3d 945, 950-51 (8th Cir. 2004).

We will go with what we got." Filing 20-1 at 4. It is difficult to imagine a more clearly expressed ratification of a contract's terms. Blues Events also continued to perform pursuant to the Agreement after the delay in the licensing agreement had occurred.[4]

In sum, even if Blues Events was properly before the Court, or even if Tucker or DMD were parties to the Agreement, the plaintiffs' fraud claims would gain no traction.

## FIDUCIARY DUTY

The plaintiffs allege that the Saltdogs breached a fiduciary duty to Blues Events by allegedly keeping the money collected from ticket sales. Filing 1 at 21-22. The defendants point to the Agreement, which contains an express provision that the joint venture it created "is not a partnership and shall not be governed by the partnership laws of any state." Filing 40-5 at 9. So, the defendants contend, "it is unclear how the Plaintiffs can claim they were owed any fiduciary duty." Filing 21 at 8.

On this point, at least, there is law supporting the plaintiffs. Under Nebraska law, a joint venture arises when there is an agreement to enter into an undertaking in the objects of which the parties have a community interest and a common purpose in performance, and each of the parties must have equal voice in the manner of its performance and control of the agencies used therein, though one may entrust performance to the other. *Evertson v. Cannon*, 411 N.W.2d 612, 624 (Neb. 1987). Each member of a joint venture has a dual status—that of principal for himself, and as an agent for the others. *Id.* So, "[o]nce a joint venture is created, each party has a right to expect the utmost good faith and square dealing in all matters which relate to the common interest, because *the venturers stand in a fiduciary relationship to each other*." *Id.* (emphasis supplied).

But again, the problem for the plaintiffs is that Blues Events cannot maintain the claim. And there is nothing to suggest that the defendants owed a fiduciary duty to Tucker or DMD. The relationship of joint venturers depends largely upon the legal intent of the parties as determined by

---

[4] Apparently without objection, as well. It is interesting to note that despite offering records of many emails and telephone calls between the parties, the plaintiffs have presented no evidence that they even inquired about when the licensing agreement would be available. It seems that such evidence would be available if the licensing agreement was as time-sensitive as the plaintiffs now contend. Given that Blues Events *implicitly* ratified the Agreement by subsequent performance despite knowledge of the alleged fraud, the failure to provide evidence of an *explicit* complaint is something akin to the dog that didn't bark. *See* Arthur Conan Doyle, *The Adventure of Silver Blaze*, in *The Original Illustrated Sherlock Holmes* 185, 196-97 (Castle Books 1980).

- 9 -

examining the facts and circumstances of the case, but the primary criterion is that the parties enter into an agreement, express or implied, as owners or principals in the endeavor. *Id.* Here, the Agreement is obviously express, and nothing in it suggests an intent to make Tucker or DMD, as opposed to Blues Events, parties to the venture. The plaintiffs do not really allege otherwise— the complaint only alleges that the defendants were "acting as Blues Events' agent and owed Blues Events a duty to act in good faith on its behalf and in its interests." Filing 1 at 21. In other words, there is not even an allegation, much less evidence, that Tucker or DMD were owed a fiduciary duty.

## CONVERSION

The plaintiffs allege that the defendants converted the box office proceeds from the concert. Filing 1 at 22. Specifically, the plaintiffs allege that the defendants kept the proceeds "in derogation, exclusion or defiance of Blues Events' ownership or title in such property." Filing 1 at 22.

Of course, Blues Events' property interests are not at issue, because Blues Events is not a proper plaintiff. And because conversion is any unauthorized or wrongful act of dominion exerted over another's property which deprives the owner of his property, the plaintiff must have a property interest in order to state a claim. *See Brook Valley Ltd. P'ship v. Mut. of Omaha Bank*, 825 N.W.2d 779, 787 (Neb. 2013). So, the question is whether Tucker or DMD had any legal or equitable interest in the box office proceeds that could be asserted through a conversion claim.

The plaintiffs argue that Tucker and DMD are proper plaintiffs because they were "intended beneficiaries" under the Agreement. Filing 39 at 6. Their argument is that

> [t]he Eighth Circuit uses the "intent to benefit test" - which requires the contract to express some intent by the parties [to] benefit the third party through contractual performance. Absence of third party name, however, does not preclude finding of intent to benefit if circumstances show otherwise. *See Dayton Development v. Gilman Financial Services, Inc.*, 299 F. Supp. 2d 933 (D. Minn. 2003).

Filing 39 at 6.

The first problem with the plaintiffs' argument is that it ignores hornbook law regarding substantive law in diversity cases: that "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). The "intent to benefit test" applied by the district

court in *Dayton Dev. Co. v. Gilman Fin. Servs.*, cited by the plaintiffs, did not articulate "Eighth Circuit" law—it quite properly applied Minnesota contract law. 299 F. Supp. at 937-38. But here, of course, Nebraska law controls.

Under Nebraska law, it is at least an open question whether an intended beneficiary of a contract would have standing to bring an action for conversion of the property from which the beneficiary is intended to benefit under the contract. *Spring Valley IV Joint Venture v. Neb. State Bank of Omaha*, 690 N.W.2d 778, 782 (Neb. 2005). But that, in turn, requires the Court to consider principles of contract law to determine if Tucker or DMD did, indeed, acquire any rights under the Agreement as intended beneficiaries. *See id.* at 782.

Beneficiaries of a contract may recover thereon, though not named as parties, if it appears by express stipulation or by reasonable intendment that the rights and interests of the unnamed parties were contemplated and provision was being made for them. *Id.* The test is whether the parties to the contract intended to confer a benefit directly upon the third party or whether the benefit to the third party was merely incidental. *Id.*

In making the distinction between an intended and an incidental beneficiary, the Nebraska Supreme Court relied on the following illustration:

> "B promises A to pay whatever debts A may incur in a certain undertaking. A incurs in the undertaking debts to C, D and E. If the promise is interpreted as a promise that B will pay C, D and E, they are intended beneficiaries . . . ; if the money is to be paid to A in order that he may be provided with money to pay C, D and E, they are at most incidental beneficiaries."

*Id.* (quoting Restatement (Second) of Contracts § 302 at 439-40 (1981)). An incidental beneficiary acquires no right against the promisor or promisee. *Id.*

In this case, Tucker and DMD are, at best, incidental beneficiaries. The right of a third party benefited by a contract to sue thereon must affirmatively appear from the language of the instrument when properly interpreted or construed. *Podraza v. New Century Physicians of Neb., LLC*, 789 N.W.2d 260, 267 (Neb. 2010). The Agreement is clear that the net profits earned by the joint venture were to be paid to Blues Events. Filing 40-5 at 5. Tucker or DMD may have expected a share as members or investors in Blues Events, although the record does not show that. But the Agreement evinces no intent by the parties to confer a benefit *directly* upon Tucker or DMD.

The closest the Agreement comes to identifying any sort of intended third-party beneficiary is in an addendum titled "Royalty Distribution," which applies to "proceeds received after repayment of production partner

- 11 -

and venue costs, repayment of investors" and explains that proceeds will be split among Blues Events, the defendants, and "Investors and Agents." Filing 40-5 at 13. But in a separate addendum, the "Investors" are identified, and are not Tucker or DMD. It is not clear what was meant by "agents." But that ambiguity is not enough to establish a genuine issue of material fact as to whether Tucker or DMD were intended beneficiaries of the Agreement.[5] On the evidence before the Court, as a matter of law, they were no more than incidental beneficiaries. As such, they lack the legal or equitable interest in the box office proceeds necessary to sustain a conversion claim.

## BREACH OF CONTRACT

Finally, the plaintiffs allege that the defendants breached the Agreement by not participating fully in promotion of the concert, by not promptly producing the licensing agreement, and in several ways by retaining the box office receipts. Filing 1 at 23. But as discussed above, neither Tucker nor DMD were parties to the contract, nor are they permitted to recover on or enforce the Agreement as third-party beneficiaries. The Nebraska Supreme Court has strictly construed who has the right to enforce a contract as a third-party beneficiary, and one suing as a third-party beneficiary has the burden of showing that a provision was for his or her direct benefit. *Podraza*, 789 N.W.2d at 267. The Agreement is not ambiguous, but even if it was—and even if all the other evidence is taken in the light most favorable to the plaintiffs—there is not evidence from which a jury could reasonably conclude that Tucker or DMD were intended third-party beneficiaries of the Agreement.

## RULE 11 SANCTIONS

In addition to moving for summary judgment, the defendants have moved for sanctions pursuant to Fed. R. Civ. P. 11(c)(2). Specifically, the defendants claim that the plaintiffs' claims were not "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law." *See* Rule 11(b)(2).

But obviously, the fact that the plaintiffs' claims were found to lack merit does not, standing alone, justify imposing sanctions—otherwise, Rule 11 would effectively amount to a fee-shifting provision for any case decided on summary judgment. The primary purpose of Rule 11 sanctions is to deter attorney and litigant misconduct. *Kirk Capital Corp. v. Bailey*, 16 F.3d 1485,

---

[5] And, the Court notes, while it is not clear where the "Royalties" to be paid pursuant to the addendum were expected to come from, it seems evident enough that the box office receipts would not have been "royalties"—meaning that even if a third party was an intended beneficiary of the addendum, it would not support a claim to the box office receipts.

1490 (8th Cir. 1994); *see also Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 392-93 (1990). While the Court has found the plaintiffs' claims to lack merit, their primary failing is based on Blues Events' lack of a Nebraska certificate of authority—a misstep, to be sure, but not the sort of misconduct that warrants an award of attorney fees. By the defendants' own admission, the proceeds of the concert remain unsettled. While the plaintiffs were unable to frame their grievance as sustainable claims for relief, it was not beyond the pale for the plaintiffs to believe that their dispute with the defendants was susceptible to judicial resolution.

The Court sees frivolous pleadings on a regular basis, and these were not frivolous. The Court finds that Rule 11 sanctions are not warranted.[6]

## CONCLUSION

Blues Events does not have capacity to maintain its claims in a Nebraska court, and neither Tucker nor DMD can properly assert any of the plaintiffs' claims. Accordingly, the Court will grant the defendants' motion for summary judgment and dismiss the plaintiffs' claims, although the Court declines to impose sanctions on the plaintiffs.

IT IS ORDERED:

1. The defendants' motion for summary judgment (filing 19) is granted.

2. The plaintiffs' claims are dismissed.

3. The defendants' motion for sanctions (filing 33) is denied.

Dated this 30th day of January, 2014.

BY THE COURT:

John M. Gerrard
United States District Judge

---

[6] The plaintiffs also suggest, in their response to the defendants' motion, that the *plaintiffs* should be awarded Rule 11 sanctions with respect to the defendants' Rule 11 motion. Filing 43 at 2,10. The plaintiffs did not file a separate Rule 11 motion, *see* Rule 11(c)(2), but to the extent that is before the Court, the plaintiffs' request is denied.